**Opinion issued February 5, 2019**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

## NO. 01-18-00751-CV

_____

## IN THE INTEREST OF E. L. A. III AND A. J. E. A., CHILDREN

---

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-03501J**

---

## MEMORANDUM OPINION

E.L.A., Jr. (Father) is appealing the trial court's order terminating his parental rights to his son, E.L.A. III (Eddie), and his daughter, A.J.E.A. (Amy). On appeal, Father argues that there is legally and factually insufficient evidence supporting the trial court's findings that (1) he committed the predicate acts under Family Code subsections 161.001(b)(1)(D), (E), and (O); and (2) termination of his parental rights

is in Eddie's and Amy's best interest. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), & (O), 161.001(b)(2). We affirm the trial court's order.

## Background

On June 24, 2017, the Department received a referral of neglectful supervision of Eddie and Amy after Father assaulted Mother while she was holding two-month old Amy, causing Amy to fall and hit her head. Eddie, who was almost two years old at the time, witnessed the assault. Mother had visible bite marks on her arms, a scar on her leg, and other unspecified injuries. According to the referral, Mother and Eddie accompanied Amy to the hospital, where Amy was evaluated and released the same day. Two days later, the Department filed an Original Petition for Protection of a Child for Conservatorship and for Termination in Suit Affecting the Parent-Child Relationship seeking conservatorship of Eddie and Amy and termination of Mother's and Father's parental rights to both children.

### A. Testimony of Ta'Nesha Pinson

The Department called caseworker Ta'Nesha Pinson as its first witness at the final permanency hearing on June 6, 2018. Pinson, who interviewed Mother at the hospital, testified that Mother claimed that Father had bullied her towards the door of the apartment and chased her when she fled outside with Amy in her arms. Father bit Mother during the chase and she and Amy fell to the ground, causing Amy to hit her head. During the interview, Pinson noticed that Mother had bite marks on her

2

arms and that she was given a tetanus shot. Mother also told Pinson that Father had been had been physically abusing her since Eddie was about six months old, which is approximately February 2016. Among her other injuries, Mother claimed that Father had broken her leg and stabbed her. She confessed to Pinson that she never reported the abuse because she was in love with him.

Mother told Pinson that her relationship with Father was on and off and that she took care of Eddie and Amy when she visited Father. Mother had been living with Father and the children since Amy was born in April 2017, but she planned to move to Nebraska. Although she initially denied using drugs, Mother admitted to Pinson that she had recently smoked marijuana and had been using the drug while breastfeeding Amy. She stated she had lived with family members and in motels before moving in with Father. Mother told Pinson that Father had been honorably discharged from the military and suffered from Post-Traumatic Stress Disorder. He was not employed, and he drank a lot. She also admitted that she and Father do not get along and that he only wants her around to watch the children.

Mother told Pinson she has a criminal history dating back to 2005, including a June 2014 conviction for felony prostitution, and for which she was sentenced to 150 days in jail, an April 2016 conviction for criminal trespass, and a November 14, 2016 charge for assault of a family member. Mother also admitted she has been

3

diagnosed with bipolar disorder, but she was not under the care of a doctor and was not currently on any medication.

Mother disclosed that Eddie and Amy are the youngest of her five children. Her first three children were placed in the Department's care in March 2014 after she tested positive for cocaine when her third child was born. Mother's parental rights to these children were terminated in May 2016 based on subsections (E) and (O) based on the court's findings that she engaged in criminal conduct and did not complete her family service plan.

Mother became pregnant during the pendency of that case and gave birth to Eddie on August 19, 2015. Pinson testified that the Department received a referral of neglectful supervision and physical abuse of Eddie on November 16, 2016. According to the referral, Father had grabbed Eddie by the hair and tossed him onto the bed. Eddie was fourteen-months old at the time. That case, which was opened due to concerns of domestic violence, was pending when the Department received the June 2017 referral.

## B.    Testimony of Bruce Jefferies

Bruce Jeffries, an expert in interpreting narcotics test results, testified that Father tested positive for narcotics use several times during the pendency of this case. According to Jefferies, Father's test results indicate that he was a heavy marijuana user at one point and that he has used cocaine on more than one occasion,

4

but he is not a regular user. Father's test results, which were admitted into evidence during the hearing, reflect that Father's hair follicle specimen tested positive for cocaine on July 6, 2017, August 18, 2017, and April 25, 2018. Father also tested positive for marijuana in July 2017 (hair and urine specimens), August 2017, November 2017 (hair and urine specimens), December 2017 (hair only), January 2018 (hair only), February 2018 (hair only), and June 2018 (hair only).[1] The hair follicle specimen that Father submitted in July 2017 was also positive for methamphetamine.

C.     **Testimony of Father**

Father also testified at the hearing. Father admitted that he assaulted Mother on October 11, 2016; he pleaded guilty to a charge of assault and was placed on nine months' deferred adjudication/community supervision. Father was on deferred adjudication/community supervision for the 2016 assault when he assaulted Mother again on June 24, 2017. Father testified that this was the first time that he bit Mother. Father pleaded guilty to the 2017 assault charge and was placed on adjudication/community supervision again.

---

[1]     Father's urine and hair follicle tests in March, April, and May 2018 were negative for marijuana.

Father denied having a problem managing his anger and characterized the 2016 and 2017 assaults on Mother as simply "mistakes."[2] Father denied ever stabbing Mother or grabbing Eddie by the hair and throwing him onto a bed, as Mother claimed. He testified that Mother could have misstated things or lied. Father also denied that he had ever been diagnosed with PTSD or any mental disorder. When asked about the results of the psychological assessment he submitted to as part of his family service plan, Father testified that he was not aware that the doctor who conducted his assessment had diagnosed him with bipolar disorder.

When asked about his drug use, Father stated he started using marijuana in 2012 or 2013, after his honorable discharge from the military. Father admitted that he and Mother lived together on and off from late 2014 until this case began in June 2017 and that they smoked marijuana when they were together, both before and after their children were born. Eddie was born on August 19, 2015 and Amy was born on April 2, 2017. Father testified that he always had custody of the children and that he was their primary caregiver. Father admitted that he had been a heavy marijuana user prior to Amy's birth. Father minimized the impact of his drug use on his children, however, by claiming that he went outside to smoke marijuana and did not use drugs in front of Eddie. He also testified that Mother, who was "running the streets" at the

---

[2] The record reflects that Father was also convicted of threatening another woman with bodily harm in 2013.

time, did not live with him and the children after Amy was born. Mother would, however, stay with them for a few days at a time and he and Mother would both use marijuana while caring for the children during her visits. He knew that Mother breastfed Amy, but he denied that she was using marijuana when she was breastfeeding.

Father stated he believed he could provide a safe and stable environment for the children. He explained that he had served in the Navy for four years and in the Army Reserves for two years and was honorably discharged. He received income through a Post-9/11 GI Bill and had an award letter that pays for his schooling at the Aviation Institute of Maintenance. Father testified that he planned to become certified as an aviation airplane and power plane mechanic. Father stated he had been living in the same apartment for a year and had a lease that was to expire at the end of the month. Father told the court that the Department did not inspect his home, even though he called them several times. He explained that he was looking into enrolling Eddie in day care and that he had a good support system, including his mother and brother, who will watch Amy and Eddie while he attends school.

Father testified that he has visited with the children regularly since the case began and he brought food and clothes to the visits. According to Father, he and the children had a great time during the visits. He said that Eddie runs into his arms and

Amy gives him hugs and kisses. He denied taking naps during visits but admitted that he nodded off one time while holding Amy.

Father testified that he completed all the tasks in his service plan. Specifically, he completed a substance abuse treatment program on January 25, 2018, the BIPP program (Battering Intervention and Prevention Program) on September 26, 2017, and anger management classes on January 26, 2018. He stated he got a certificate for completion of his parenting classes in November 2017. Father testified that these classes taught him how to respect his partner, control his emotions, and appropriately discipline his children. He also stated he did not understand that he had to test negative on every single drug test to comply with his plan.

Father admitted that it was a mistake for him to have used marijuana while caring for the children and testified that the mistake had been fixed because he was now drug-free. He stated he does not currently use drugs and will not return to using them. He also denied ever using cocaine, despite drug test results to the contrary. He stated that his marijuana levels were the highest at the beginning of this case and had since decreased to zero. He claimed that the positive drug test results for cocaine and methamphetamine were wrong. Father speculated that the last time he smoked marijuana was probably in August or September 2017. When asked about Jeffries's testimony that he had high levels of marijuana in January 2018, Father responded

8

that his urine test was negative, and that the marijuana was only showing up in his hair follicle test.[3]

Father also testified that it was a mistake for him to hook up with Mother, use drugs with her, and assault her. He claimed that he had not had any contact with her since the case started and he did not intend to contact her in the future.

At the end of Father's testimony, the court recessed the hearing until July 12, 2018.

**D.     Further Testimony of Bruce Jeffries**

When trial resumed on July 12, 2018, Bruce Jeffries was asked to take the stand again. Jeffries testified that Father had submitted to another drug test the day of the last hearing, June 6, 2018. Father's zero tolerance drug test result from that day was positive for marijuana. Jeffries stated if he had run a normal standard panel test, as opposed to a zero-tolerance panel, Father's result would have been negative. Jeffries stated that if Father had stopped all drugs when the case started in June 2017, the zero-tolerance panel test should have been zero.

---

[3]     Jefferies testified that marijuana can be detected in a hair follicle for months after use.

**E.     Testimony of Donquetta Simmons**

Donquetta Simmons, Pinson's supervisor, told the court that she has been the supervisor assigned to this case since the children came into the Department's care in 2017.

Simmons testified that the Department recommends terminating Mother's and Father's parental rights to both children. According to Simmons, termination of Mother's rights is appropriate and in the children's best interest because Mother has effectively abandoned the children. Mother has not made any effort to visit Eddie and Amy or provided any support for them since they came into the Department's care. She has been a "no-show" throughout the proceeding. Simmons testified that termination of Father's parental rights was also appropriate and, in the children's best interest, because Father has engaged in endangering behavior, as evidenced by his continued use of illegal drugs and his history of domestic violence.

Simmons explained that the Department was concerned about Father's ability to provide a stable home for the children, given his inability to maintain sobriety. Specifically, Father has tested positive for drugs throughout the case and that Father's drug use is dangerous to the children because they are very young and cannot take care of themselves. The children depend on stable adults who are in their right mind to care for them. Simmons testified that Father had admitted that he and Mother used drugs while they were living together and raising their children and that

there had been instances of domestic abuse, including a 2016 assault that occurred when Mother was pregnant with Amy.

Father's illegal drug use is also dangerous to the children because he received deferred adjudication for the June 2017 assault on Mother, and a condition of his deferment required him to refrain from using illegal drugs. If Father fails to complete his deferment conditions, he may be incarcerated, in which case the children would likely come back into the Department's care and the conservatorship process would start all over again.

Simmons testified that although Father had been provided with a family service plan and as well as the resources and tools he needed to be reunited with the children, he did not complete all the plan's requirements for reunification. Among other things, Simmons testified that Father had not been successfully discharged from individual therapy, maintained sobriety, or shown he had learned anything from the services he did complete. Specifically, Simmons noted that although Father completed a domestic violence course, he has been aggravated, agitated and aggressive on the phone. As a result, she opined, he has not shown that he is able to stabilize his mood or behavior because. Simmons acknowledged, however, that this behavior could have been because of his frustration over having his children in the Department's care.

Simmons further testified that Father has not demonstrated that he understands how his past behavior has affected Amy and Eddie, as evidenced in part by his behavior during his visits with the children. Although he visits with the children monthly, Father has fallen asleep and has left the children crying while he takes a phone call during visits. During one visit, she noted, the Department had to contact security due to Father's "outburst and loud behavior." She stated that after visits with Father and being returned to the foster parents, Eddie would have increased night terrors, and increased aggression, and crying.

Simmons testified that the Department's goal is unrelated adoption. She explained that Eddie and Amy are happy, playful, well-adjusted and have a close relationship with their foster parents. The foster parents take Eddie and Amy to therapy, medical and dental appointments and have placed them in daycare. Unlike Father, the children's foster parents do not have a criminal history and neither parent has ever tested positive for drugs. According to Simmons, the children have had less anxiety since being in their foster home and Eddie, in particular, has been acting out less. Simmons has no concerns with Eddie and Amy being placed for adoption with the foster parents.

## F.    Testimony of Ayeshia Powell

Child Advocates, Inc., through the volunteer advocate of record, Ayeshia Powell, also testified. Powell told that court that she has been involved with Eddie

12

and Amy since the case began and that she had observed the children interact with their foster family and with Father.

Powell testified that children have made significant progress since coming into care. According to Powell, when Eddie first came into the Department's care, he was aggressive and quiet, and he did not like to have his diaper changed. Although Eddie's behavior has improved since he began living with his foster family, he tends to regress after visits with Father. According to Powell, she saw Eddie after three visits with Father. Each time, she observed, Eddie was aggressive and he withdrew into himself and did not want to interact with others. Powell further testified that when Amy came into the Department's care, she had acid reflux and did not appear to be getting the care she needed, but now she is caught up on her immunizations, gaining weight, and meeting her developmental milestones.

According to Powell, Eddie and Amy have a strong bond with their foster parents, whom they call "mommy" and "daddy." The children are affectionate towards their foster parents, and Amy cries and tries to follow her foster mother if she leaves the room. Child Advocates does not have any concerns about the foster family's ability to care for the children.

Powell's supervisor, Nicholas Alvarado, testified that he had concerns about Father's ability to provide the children with a safe home environment. Specifically, Alvarado noted that Father has difficulty controlling his emotions, behaves

erratically, and becomes aggressive and yells. Alvarado was particularly concerned about Father's ability to care for Eddie, given Eddie's anger and behavioral issues. Alvarado also expressed concerns about Father's history of domestic abuse and illegal drug use.

Alvarado testified that when he visited Father's apartment in February 2017, the home was unfurnished, aside from a bed in the master bedroom and a dresser and TV in a second bedroom, and there was no cover on the furnace. He testified that since Father furnished the home, he has not asked him to reinspect it. Alvarado testified that termination of Father's and Mother's parental rights was in the children's best interest because Child Advocates did not believe that Father would be able to provide Eddie and Amy with the consistent care and the therapy sessions they would need.

## G.  Further Testimony of Father

Father testified regarding some changes in his circumstances since the last hearing. Specifically, Father testified that he was now employed with Greenfield Aviation as an apprentice technician/aircraft-mechanic and worked in the composite shops. He stated he earns $11.50 an hour and purchased a 2017 Nissan Altima. He stated he also renewed the lease to his apartment. Father denied using drugs.

Father denied being aggressive, yelling, or using foul language when he spoke to Simmons and claimed that he was just frustrated, and he missed his babies. He

14

stated he completed his service plan and was told by the Department that he did. Father stated he equipped his apartment for his children to return home and felt it was in their best interest that the children be returned to his care.

When asked about his drug use, Father stated it had been a while since he used drugs and although he could not recall an exact date, he knew he did not use any illegal substances in 2018. He speculated that it was probably before November/December 2017 and claimed that his drug tests proved that. Father acknowledged he used marijuana in the past to cope with stress but said that he does not need it anymore.

## H.    Testimony of Foster Parents

Amy's and Eddie's foster parents also testified at the hearing. Their foster mother testified that the children had been living with them since October 2017 and that they wanted to adopt both children if Mother's and Father's parental rights were terminated. Eddie's foster mother testified that Eddie had significant behavioral and anger issues when he first came to live with them. He was afraid of being hit and needed constant reassurance that he would not be struck while living in their home. Among other things, Eddie had several tantrums a day when he first came to live with them. She described one tantrum that lasted almost two hours, during which time he hit his head against a wall and scratched his arms. Eddie's behavior has improved through weekly therapy sessions. Now, he shows aggressive behavior,

such as biting, kicking, and pulling hair, only after he visits with Father. After his visits with Father, Eddie also talks about things that scare him and does not let his foster parents change his diaper. The foster mother recounted one morning after a visit when she found Eddie smearing himself with feces. Eddie also has very controlling behaviors with respect to food. According to his foster mother, Eddie experiences night terrors for as long as ten days after his visits with Father. He has had as many as eight episodes in one night. She stated that it can take her and her husband several days to help Eddie calm down after a visit with Father.

The foster mother stated she follows the recommendations of Eddie's therapist and has strict schedules in place and a therapy table for Eddie. Eddie's immunizations are up to date, and she takes him for all his scheduled appointments with his doctor, his dentist, and his therapist.

With respect to Amy, the foster mother testified that the baby initially had reflux and vomited a lot, but her condition improved when they switched her to goat's milk. Other than that, Amy was "a great growing toddler."

The foster mother confirmed that the children were attached her and her husband. Amy does not like other adults. The foster mother stated she believed she and her husband could provide the children stability, love, and nurturing. She stated that she and her husband had been married for five years and had lived in their current home for two years.

16

The children's foster father testified that he wants children to grow up in a safe and loving environment and he wants them to be healthy, both physically and emotionally. He stated that Eddie refers to him as "daddy."

I.      **Kimberly Zander**

Eddie's therapist, Kimberly Zander, also testified at the hearing and her therapy notes were admitted into the record, including a report she prepared. Zander stated that Eddie was referred to her for behavior issues such as aggression, temper tantrums, and night terrors. She has been treating Eddie once or twice a week since January 2018.

Zander testified that at the beginning of his therapy Eddie was very chaotic and felt a very strong need for control. Although Eddie's behavior has regressed from time to time, Zander stated that Eddie he has made tremendous. Eddie is now able to separate more easily from family members, experiences fewer night terrors, and is learning alternative behaviors for expressing frustration and anger.

Zander's report noted that Eddie has demonstrated behaviors that supported a diagnosis of PTSD, which manifests in symptoms of separation anxiety, night terrors, and physical aggression. Zander testified that Eddie has engaged in post-traumatic play on multiple occasions during his therapy sessions, including several instances with baby dolls. Post-traumatic play occurs when young children reenact trauma they have previously experienced. On one occasion, Eddie threw a baby doll

in the bed, told it to go to sleep, and then started hammering on it. On a separate occasion, Eddie pretended to feed a baby doll but then grabbed a broom and hit the baby with the broom. She also testified that food is very important to Eddie and that she believes that its importance to him indicates that Eddie has experienced some type of food insufficiency.

Zander's notes also reflect that Eddie told his foster mother one time that, "Bad guy hurt neck. My dad hurt neck." The next month, the foster mother told Zander that she heard Eddie talking to an imaginary person he called "bad guy," and that Eddie told his friend, "Bad guy, no owie me." Later that same month, Eddie woke up during the night in distress and repeatedly hit his foster mother.

Zander, who had observed one visit between Father and the children, noted that Eddie was affectionate to Father and that Father read books to both children during the visit. Zander was concerned, however, that Father was unable to read emotional cues from the children. Specifically, Zander noted that Father and Eddie had been playing roughly and that although Eddie clearly wanted to stop, Father did not seem to recognize this. She also saw noticed that Eddie would mimic some of Father's behaviors in the playroom after a visit, such as spitting.

Zander also noted that visits with Father tended to exacerbate Eddie's aggressive and controlling behaviors and that Eddie would experience an increase in night terrors and regressed behavior for several afterward. Zander opined that

18

returning Eddie and Amy to Father's care would be detrimental to their future development and mental health because the Department's records indicated that Father was the perpetrator of the violence that caused Eddie's PTSD and triggers his recurring symptoms.

Zander testified that Eddie is very bonded with his foster parents. She stated that structure, consistency, and a lot of positive reinforcement are the best practices with children like Eddie who have experienced trauma. Based on her observations, Zander concluded the foster parents were able provide the safe, structured, and predictable environment that Eddie needed to thrive.

## Sufficiency of the Evidence

In three issues, Father argues on appeal that there is legally and factually insufficient evidence supporting the trial court's findings that: (1) he committed the predicate acts under sections 161.001(b)(1)(D), (E), and (O); and (2) termination of his parental rights is in Eddie's and Amy's best interest.

## A. Standard of Review and Applicable Law

A parent's right to the care, custody, and control of his child is a liberty interest protected under the Constitution, and we strictly scrutinize termination proceedings on appeal. *See Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *see also Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Clear

19

and convincing evidence must support an involuntary termination. *Holick*, 685 S.W.2d at 20 (citing *Santosky*, 455 U.S. at 747–48, 102 S. Ct. at 1391–92).

Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007. "This standard guards the constitutional interests implicated by termination, while retaining the deference an appellate court must have for the factfinder's role." *In re O.N.H.*, 401 S.W.3d 681, 683 (Tex. App.—San Antonio 2013, no pet.). Thus, we do not re-weigh issues of witness credibility but defer to the factfinder's reasonable determinations of such matters. *See In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

In conducting a legal-sufficiency review in an appeal from a termination case, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, disregarding all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *See id.* If, after conducting a legal sufficiency review of the record, we determine that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then we must conclude that the evidence is legally insufficient. *See id.*

In conducting a factual-sufficiency review in a parental-rights-termination case, we determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a factfinder reasonably could have formed a firm conviction or belief about the truth of the matter on which the Department bore the burden of proof. *See In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable factfinder could not have resolved the dispute in favor of its finding. *See In re J.F.C.*, 96 S.W.3d at 266–67. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* at 266.

To prevail in a termination case, the Department must establish that one or more of the acts or omissions enumerated under Texas Family Code subsection 161.001(b)(1) occurred and that the termination is in the best interest of the child, pursuant to subsection 161.001(b)(2). *See* TEX. FAM. CODE § 161.001(b); *see also In re C.H.*, 89 S.W.3d at 23. "Only one predicate finding under section [161.001(b)(1)] is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

**B.**     **Sufficiency of the Evidence Supporting Termination of Father's Rights Pursuant to Subsections 161.001(b)(1)(D) & (E)**

In his first issue, Father argues that legally and factually insufficient evidence supports the trial court's finding he committed the predicate act under subsections 161.001(b)(1)(D) and (E).

Subsection 161.001(b)(1)(E) provides that a parent's rights can be terminated when he has "engaged in conduct or knowingly placed the child with persons who engaged in conduct when he has when he has which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). "'To endanger' means to expose a child to loss or injury or to jeopardize a child's emotional or physical health." *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *see also In re K.P.*, 498 S.W.3d 157, 171 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (citing *Tex. Dep't Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987), and *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996)).[4]

To satisfy subsection (E), the parent's conduct must cause the endangerment, and the endangerment must be the result of a voluntary, deliberate, and conscious course of conduct by the parent rather than a single act or omission. *See In re K.P.*,

---

[4]     "[A] child is endangered when the environment creates a potential for danger which the parent is aware of but disregards." *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

498 S.W.3d at 171; *Jordan*, 325 S.W.3d at 723. The endangering conduct, however, does need not be directed at the child, and it is not necessary that the child suffer any injury because of the conduct. *See In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012) (citing *Boyd*, 727 S.W.2d at 533); *see also In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (holding that endangering conduct is not limited to actions directed toward child); *Jordan*, 325 S.W.3d at 723 (holding that danger to child may be established even if conduct is not directed at child and child suffers no actual injury).

Furthermore, the specific danger to the child's well-being may be inferred from parental misconduct standing alone and courts may consider parental conduct that did not occur in the child's presence, including conduct that occurred before the child's birth and before and after the child has been removed from the home. *See Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see also In re E.N.C.*, 384 S.W.3d at 804–05 (stating criminal offense occurring before child is born can be relevant factor in establishing whether parent engaged in endangering course of conduct for purposes of subsection E).

Evidence of a parent's criminal conduct, convictions, and imprisonment may support a finding of endangerment under subsection 161.001(b)(1)(E) because such conduct subjects a child to a life of uncertainty and instability. *See In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (stating

23

parent's conduct that subjects child to life of uncertainty and instability endangers child's physical and emotional well-being); *see also In re A.A.M.*, 464 S.W.3d 421, 426–27 (Tex. App.—Houston [1st Dist.] 2015, no pet.). A parent's use of illegal drugs may also support termination under subsection 161.001(1)(E) because "it exposes the child to the possibility that the parent may be impaired or imprisoned." *Walker*, 312 S.W.3d at 617; *see also In re J.O.A.*, 283 S.W.3d at 345.

Even if it transpires outside the child's presence, a parent's drug use can constitute endangerment because it significantly harms the parenting relationship. *See J.O.A.*, 283 S.W.3d at 345; *Boyd*, 727 S.W.2d at 533; *Walker*, 312 S.W.3d at 617. In addition, "a parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." *In re K.C.F.*, No. 01–13–01078–CV, 2014 WL 2538624, at *10 (Tex. App.—Houston [1st Dist.] June 5, 2014, no pet.) (mem. op.).

Deferring to the trial court's credibility determinations, the record supports the trial court's findings that Father engaged in conduct that endangered the physical or emotional well-being of Eddie and Amy for several reasons.

Here, Father pleaded guilty to assaulting Mother in 2016 and 2017. Mother was pregnant with Amy when the 2016 assault occurred and she was holding Amy during the 2017 assault, which was witnessed by young Eddie and resulted in Amy

hitting her head and being taken to the hospital. Although he denied it, Mother claimed that Father had been physically assaulting her since Eddie was a baby and that she had been injured several times during these assaults, including once when Father broke her arm and second time when Father stabbed her. Although he denied it, the record also contains some evidence that in October 2017 Father grabbed Eddie by the hair and threw him onto a bed. Father's history of domestic violence and assaultive conduct towards Mother and the children is further evidence supporting the endangerment finding. *See In re J.O.A.*, 283 S.W.3d at 345 (holding that endangering conduct is not limited to actions directed toward child); *Jordan*, 325 S.W.3d at 723 (holding that danger to child may be established even if conduct is not directed at child and child suffers no actual injury); *see also Walker*, 312 S.W.3d at 617 ("Evidence as to how a parent has treated another child or spouse is relevant regarding whether a course of conduct under section [161.001(b)(1)(E)] has been established.").

In addition to his history of domestic violence and assaultive conduct, Father also has a lengthy history of illegal drug use. Father admitted that he smoked marijuana on and off before and after Eddie and Amy were born and that he continued to use marijuana until the case began in June 2017, even though he was the children's primary care giver. He was also aware that Mother smoked marijuana when she was staying or living with him and the children. Father attempted to

minimize the impact of his drug use on his children, however, by claiming that he went outside to smoke marijuana and did not use drugs in front of Eddie. Father's continued drug use, even outside of Eddie's presence, supports a finding of endangerment under subsection (E) because a parent's illegal drug use significantly harms the parenting relationship and "exposes the child to the possibility that [Father] may be impaired or imprisoned." *Walker*, 312 S.W.3d at 617; *see also J.O.A.*, 283 S.W.3d at 345; *Boyd*, 727 S.W.2d at 533.

Father also tested positive for several illegal drugs after the case began in June 2017, including three positive tests for cocaine in July 2017, August 2017, and April 2018, and a positive test for methamphetamine in July 2017. Notably, four of these positive drug tests occurred after he completed the substance abuse treatment program required by his family service plan on January 25, 2018, including the April 25, 2018 and June 2018 tests in which he tested positive for cocaine and marijuana, respectively. This is further evidence of endangerment. *See In re K.C.F.*, 2014 WL 2538624, at *10.

Although Father denied using drugs after the case began in June 2017 and he denied ever using cocaine and methamphetamine, the trial court could have reasonably disregarded Father's claims in the face of the drug results and expert testimony to the contrary. *See In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (stating factfinder determines issues of credibility).

26

Finally, Father has a history of repeatedly engaging in criminal conduct, both before and after the children were born. This conduct includes his 2016 and 2017 convictions for assaulting Mother, his ongoing use of illegal narcotics, and his 2103 conviction for threatening another woman with bodily injury. This history of criminal conduct can support a finding of endangerment under section 161.001(b)(1)(E) because such criminal conduct subjects a child to a life of uncertainty and instability. *See In re S.R.*, 452 S.W.3d at 360; *see also Walker*, 312 S.W.3d at 617.

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that Father engaged in conduct or knowingly placed Amy and Eddie with persons who engaged in conduct that endangered the children's physical or emotional well-being. *See In re J.O.A.*, 283 S.W.3d at 345; *see generally* TEX. FAM. CODE § 161.001(b)(1)(E). Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination of Father engaged in conduct or knowingly placed Amy and Eddie with persons who engaged in conduct which endangered the children's physical or emotional well-being. *See In re J.O.A.*, 283 S.W.3d at 345; *see generally* TEX. FAM. CODE § 161.001(b)(1)(E). Accordingly, we hold that legally

and factually sufficient evidence supports the trial court's finding that Father committed the predicate act set forth under subsection (E).

We overrule Father's first issue with respect to the legal and factual sufficiency of the evidence supporting the trial court's finding that Father committed the predicate act set forth under subsection (E).

Having found that the evidence is both legally and factually sufficient to support the predicate finding of endangerment under subsection (E), we need not address the Father's challenges to the sufficiency of the evidence supporting the trial court's findings under subsections (D) and (O). *See In re A.V.*, 113 S.W.3d at 362.

## C. Best Interest

In his third issue, Father argues that legally and factually insufficient evidence supports the trial court's finding that termination of his parental rights is in Eddie's and Amy's best interest.

There is a strong presumption that the best interest of a child is served by keeping the child with the child's natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement of the child in a safe environment, however, is also presumed to be in the child's best interest. TEX. FAM. CODE § 263.307(a). A child's need for permanence through the establishment of a "stable, permanent home" has been recognized as the paramount consideration in a

best-interest determination. *See In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.).

Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the best interest finding: the desires of the child; the present and future physical and emotional needs of the child; the present and future emotional and physical danger to the child; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This list of factors is not exhaustive, however, and evidence is not required on all the factors to support a finding that terminating a parent's rights is in the child's best interest. *Id.*; *see also In re D.R.A.*, 374 S.W.3d at 533.

The Texas Family Code also sets out similar factors to be considered in evaluating the parent's willingness and ability to provide the child with a safe environment, including: the child's age and physical and mental vulnerabilities; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's

close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities. *See* TEX. FAM. CODE § 263.307(b); *see also In re R.R.*, 209 S.W.3d at 116.

Courts may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence when conducting the best interest analysis. *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). Evidence supporting termination under one of the predicate grounds listed in section 161.001(b)(1) can also be considered in support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28 (holding same evidence may be probative of both section 161.001(b)(1) grounds and best interest). A parent's past conduct is probative of his future conduct when evaluating the child's best interest. *See In re O.N.H.*, 401 S.W.3d at 684. A factfinder may also infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent when assessing the best interest of the child. *In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.) (citing *In re B.K.D.*, 131 S.W.3d 10, 17 (Tex. App.—Fort Worth 2004, pet. denied)).

In this case, Eddie and Amy are currently placed in a safe, stable, and loving home with foster parents who they have bonded with and who want to adopt them. By all accounts, the parents are meeting Eddie's and Amy's current emotional, financial, and physical needs, and the Department believes they will be able to do so in the future. *See generally In re O.N.H.*, 401 S.W.3d at 684 (stating past conduct is probative of parent's future conduct when evaluating child's best interest). There is nothing in the record indicating otherwise. Unlike Father, the children's foster parents do not have a criminal history, use illegal narcotics, or exhibit difficulty managing their emotions. The foster parents also appear to have a stable marriage and good parenting skills, and the Department does not foresee any issue preventing the foster parents from adopting Eddie and Amy if Mother's and Father's parental rights are terminated.

The evidence supporting the trial court's finding that Father engaged in a course of conduct endangering to Eddie and Amy under subsection E, including Father's history of assaulting Mother, including at least once in Eddie's presence, and his assault of Eddie, also weighs in favor of termination of Father's parental rights with respect to both children. *See Edwards v. Tex. Dep't of Protective & Regulatory Servs.*, 946 S.W.2d 130, 138 (Tex. App.—El Paso 1997, no writ); *see also In re A.M.*, 495 S.W.3d at 581 (relying in part on "history of assaultive conduct

31

between the mother and father" in affirming decision that termination of father's rights was in child's best interest).

Father's use of illegal narcotics after the children were removed from his custody also demonstrates that he is "not willing and able to provide the child with a safe environment—a primary consideration in determining the child's best interest." *In re A.C.*, 394 S.W.3d at 642; *see also In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("A parent's drug use supports a finding that termination is in the best interest of the child."). There is also evidence that Father allowed the young children to be around Mother when she was using drugs and that he was aware Mother was smoking marijuana and breastfeeding Amy. Although Father claims that he stopped using illegal narcotics when the children came into care, the trial court could have reasonably disregarded Father's claims in the face of the drug test evidence, expert testimony to the contrary, and Father's admission that he used marijuana as late six months prior to trial. *See In re J.P.B.*, 180 S.W.3d at 573 (stating factfinder weighs issues of credibility). Furthermore, the trial court could reasonably infer from Father's admissions that he used illegal drugs when he was caring for the children and his use of drugs with Mother while they were living together with the children will occur in the future. *See In re D.M.*, 452 S.W.3d at 471 (stating factfinder may infer that parent's past conduct endangering

child's well-being may recur if child is returned to parent when assessing whether termination of parent's parental rights is in child's best interest).

The record also demonstrates that Father has made progress since the children were removed from his care. Father is presently employed, he has renewed the lease on his apartment, which is now furnished, and he bought a vehicle. Although this is some evidence that Father may be able to meet at least some of the children's present and future physical and emotional needs, such evidence does not outweigh the evidence to the contrary, including Father's inability to remain sober during the pendency of the case, including after he completed substance abuse treatment, or his anger issues, both of which are concerns for the Department and Child Advocates.

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that termination of Father's parental rights is in Amy's and Eddie's best interest. *See In re J.O.A.*, 283 S.W.3d at 345. Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination of Father's parental rights is in Amy's and Eddie's best interest. *See id.* Accordingly, we hold that legally and factually sufficient evidence supports the trial court's best interest finding.

We overrule Father's third issue.

## Conclusion

We affirm the trial court's order terminating Father's parental rights to Eddie and Amy.


Russell Lloyd
Justice


Panel consists of Justices Lloyd, Kelly, and Hightower.